UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TAMARA R. KUITTINEN and<br>TERO P. KUITTINEN<br>    Plaintiffs<br><br>v.<br><br>THE TRANS-ATLANTIC MOTORS, INC. d/b/a<br>RILEY VOLVO CARS STAMFORD d/b/a<br>VOLVO OF STAMFORD and VOLVO CAR<br>USA LLC<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br><br><br><br><br><br><br><br><br><br><br>APRIL 28, 2017 |

COMPLAINT

I. INTRODUCTION

1.  This is a suit brought under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and the Connecticut Unfair Trade Practices Act against The Trans-Atlantic Motors, Inc. d/b/a Riley Volvo Cars Stamford d/b/a Volvo of Stamford ("Trans-Atlantic"), an authorized seller of Volvo motor vehicles, and Volvo Car USA LLC ("Volvo"), a manufacturer of Volvo motor vehicles in the Unites States, in connection with the sale of a motor vehicle. Plaintiffs bring this action to recover actual damages, punitive damages, and reasonable attorney's fees and costs.

II. PARTIES

2.  Plaintiff, Tamara R. Kuittinen ("Kuittinen" or "Plaintiff"), is a natural person residing in Ridgefield, Connecticut, and she is a "consumer" as that term is defined by the FCRA, 15 U.S.C. § 1681a(c).

3.  Plaintiff Tero P. Kuittinen is a natural person residing in Ridgefield, Connecticut, and he is Kuittinen's husband.

4. Defendant Trans-Atlantic is a Connecticut corporation that operates an automobile dealership in Stamford, Connecticut.

5. Defendant Volvo is a Delaware limited liability company with a principal place of business in Rockleigh, New Jersey that manufactures Volvo motor vehicles for sale to dealerships throughout the United States, including Trans-Atlantic.

### III. JURISDICTION

6. Jurisdiction in this Court is proper pursuant to 15 U.S.C. § 1681p. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

7. This Court has jurisdiction over Trans-Atlantic because it is organized under the laws of this State and it regularly conducts business in Connecticut. This Court has jurisdiction over Volvo because it regularly conducts business in Connecticut.

8. Venue in this Court is proper, because the Plaintiffs are residents of Connecticut and the transaction that is the subject of this litigation occurred within this State.

### IV. FACTUAL ALLEGATIONS

9. On or about August 21, 2015, Kuittinen and Tero Kuittinen purchased a 2016 Volvo XC90 )(the "First Vehicle") from Trans-Atlantic pursuant to a Retail Installment Contract (the "First Contract").

10. The First Vehicle was subject to a written, express warranty by Volvo.

11. The Purchase Order for the First Vehicle stated a cash selling price of $54,595.00 and total cash price, including add-ons, taxes, and fees, of $61,353.02.

12. Kuittinen and Tero paid a deposit of $1,000 and an additional $1,000 on the date of delivery of the First Vehicle, for a total down payment of $2,000.

13. Kuittinen and Tero Kuittinen financed the balance of $59,353.02 pursuant to a Retail Installment Contract (the First Contract") at an annual percentage rate of 4.94%.

14. The First Contract was subsequently assigned by Trans-Atlantic to JP Morgan Chase ("Chase Bank").

15. Soon after purchase, Kuittinen and Tero Kuittinen experienced multiple problems with the First Vehicle including malfunctions to the computer system, the Blind Spot Information System, the lock system, and the rear camera, as well as a defective seatbelt, multiple error messages regarding the key system malfunction and parking.

16. Kuittinen and Tero Kuittinen brought the First Vehicle to Trans-Atlantic as an authorized service facility for Volvo for repairs on at least six occasions between September 15, 2015 and July 16, 2016, but it was unable to repair all of the defects with the First Vehicle.

17. In approximately March, 2016, Kuittinen told Paul Zulkeski of Trans-Atlantic that she wanted Volvo to replace the First Vehicle under the Connecticut Lemon Law.

18. Kuittinen returned the First Vehicle to Trans-Atlantic for service in late June, 2016 after the vehicle's error messages were illuminating for the Blind Spot Information System, the keyless entry and the rear camera.

19. Trans-Atlantic had the First Vehicle for approximately two and one-half weeks, and Kuittinen informed Trans-Atlantic that she would not take the vehicle back and she wanted a replacement under the Connecticut Lemon Law.

20. Trans-Atlantic informed Kuittinen that it would replace the First Vehicle with a new Vehicle, and it provided Kuittinen with a loaner vehicle to use while it located a

suitable replacement.

21. Several weeks later, Sue Prime of Trans-Atlantic notified Kuittinen that a shipment would be arriving, and she assured Kuittinen that the vehicle would be a "swap", that no money would change hands and that they would transfer the loan balance for the First Vehicle to the replacement Vehicle.

22. Trans-Atlantic was unable to locate another new 2016 Volvo XC90 and it informed Kuittinen that it would instead replace the First Vehicle with a 2017 model, (the "Second Vehicle").

23. Trans-Atlantic told Kuittinen to return to the dealership on July 13, 2016 to finalize the replacement of the First Vehicle and take delivery of the Second Vehicle.

24. Kuittinen believed that Trans-Atlantic was substituting the First Vehicle with the Second Vehicle and that, as such, she would not need to apply for new credit or sign new contract documents.

25. Unbeknownst to Kuittinen, Trans-Atlantic submitted credit applications in Kuittinen's name to Fifth Third, Chase Auto and Volvo Financial, and possibly to other banks and finance companies, even though Kuittinen had not applied for credit and had not consented to having her credit report accessed.

26. While waiting at the dealership for Trans-Atlantic to complete the transaction, Kuittinen received alerts on her cell phone that new credit inquires were made to her credit that day.

27. Kuittinen asked Trans-Atlantic why it pulled her credit, and she was told by AJ Riley of Trans-Atlantic that Chase Bank did not permit the transaction to be handled as a substitution of collateral because the Second Vehicle had a different vehicle

identification number and that a new finance agreement would need to be entered.

28. Riley assured Plaintiff that Trans-Atlantic was "keeping all of your numbers the same" and that the "loan will look exactly the same because the monthly payments were exactly the same."

29. Trans-Atlantic prepared a second Purchase Order that listed a cash selling price of $57,182.00 for the Second Vehicle and a total cash price, including add-ons, taxes, and fees, of $61,050.51.

30. The second Purchase Order reflected a trade-in-allowance for the First Vehicle of $40,000, even though she owed a balance of $52,310.29 to Chase, and the excess debt of $12,310.29 was added to the cost of the purchase of the Second Vehicle.

31. Trans-Atlantic prepared a second Retail Installment Contract (the "Second Contract") that listed a cash down payment of $13,602.25 even though Kuittinen did not make any cash payment.

32. The Second Contract listed an amount financed of $58,758.55 at an annual percentage rate of 5.29%.

33. Trans-Atlantic kept Kuittinen waiting at the dealership for hours before presenting her with documents to sign.

34. Trans-Atlantic knew that Kuittinen worked as an emergency room physician and that she was expecting to be at the dealership for only a brief time to drop-off the loaner vehicle, pick up the Second Vehicle, and sign documents acknowledging the exchange, and it knew that she was very late for her shift by the time that it presented her with documents to sign.

35. Because she was late for her shift and anxious to take possession of the Second Vehicle so that she could get to work, Kuittinen quickly signed the papers presented to her without realizing that the transaction had been structured as a trade-in rather than an exchange under the Connecticut Lemon Law.

36. Kuittinen did not realize at the time that she signed the new documents that the contract balance on the Second Contract that was $ 6,448.26 greater than the balance that she owed on the First Contract, and she did not notice that she was paying a higher annual percentage rate on the Second Contract than the rate on the First Contract.

## V. CAUSES OF ACTION

### A. FAIR CREDIT REPORTING ACT
As to Trans-Atlantic (as to Kuittinen only)

37. Paragraphs 1 through 36 are herein incorporated.

38. Kuittinen did not authorize Trans-Atlantic to access her credit report or to submit it to third parties prior to its accessing of her reports and submitting her credit application to third parties.

39. Trans-Atlantic violated the FCRA § 1681b(f) when it used or obtained Kuittinen's credit report without Kuittinen's authorization and without Kuittinen's knowledge.

40. For Trans-Atlantic's willful violations of the FCRA, Kuittinen's is entitled to actual damages or statutory damages of between $100 and $1,000, punitive damages, and attorney's fees and costs pursuant to 15 U.S.C. § 1681n.

41. For Trans-Atlantic's negligent violations of the FCRA, Kuittinen's is entitled

to actual damages plus attorney's fees and costs pursuant to 15 U.S.C. § 1681o.

## B.  CONNECTICUT UNFAIR TRADE PRACTICES ACT
### As to Trans-Atlantic

42. Paragraphs 1 through 41 are herein incorporated.

43. Trans-Atlantic has acted unfairly and deceptively by knowingly treating the First Vehicle as a trade-in on the Second Contract, rather than treating it as a return under the lemon law and by misrepresenting the nature of the transaction to Kuittinen.

44. Trans-Atlantic further violated CUTPA by its FCRA violations as described above and by listing a false down payment in the Second Contract.

45. Trans-Atlantic further violated CUTPA by its inclusion of a false down payment on the Second Contract and by marking-up the interest rate on the Second Contract so that the monthly payment would approximate the payment on the First Contract.

46. Plaintiffs have suffered an ascertainable loss because they are more indebted on the Second Contract, they are paying a higher annual rate of interest, and they will be required to either make higher payment amounts or make payments for a longer duration or both.

47. Trans-Atlantic's violations of CUTPA were willful and undertaken with a disregard for the rights of consumers, entitling Plaintiffs to punitive damages.

48. For Trans-Atlantic's CUTPA violations, Plaintiffs are entitled to damages, and in the discretion of the Court, punitive damages, attorney's fees and costs.

### C.  CONNECTICUT UNFAIR TRADE PRACTICES ACT
### As to Volvo

49.  Paragraphs 1 through 48 are herein incorporated.

50.  At all times herein, Trans-Atlantic was acting as Volvo's agent and with Volvo's knowledge with respect to Plaintiffs' demand that the Vehicle be replaced under the Connecticut Lemon Law, Conn. Gen. Stat. § 42-179 *et seq.*

51.  Volvo had affirmative obligations under the Connecticut Lemon Law to repurchase or replace the First Vehicle when Trans-Atlantic, as its authorized service agent, was unable to repair the Volvo or Volvo was unable to repair defects that were subject to Volvo's express warranty after having been given a reasonable opportunity to do so.

52.  Volvo's failure to repurchase or replace the Vehicle pursuant to the Connecticut Lemon Law was a per se violation of CUTPA pursuant to Conn. Gen. Stat. § 42-184.

53.  On information and belief, Volvo contributed all or some of the false downpayment reflected in the purchase order to facilitate the sale of the Second Vehicle as a trade-in transaction so that the First Vehicle could be remarketed without the stigma of being a "manufacturer buyback" vehicle, a further violation of the Connecticut Lemon Law and CUTPA.

54.  Plaintiffs have suffered an ascertainable loss because they are more indebted on the Second Contract, they are paying a higher annual rate of interest, and they will be required to either make higher payment amounts or make payments for a longer duration or both.

55. For Volvo's CUTPA violations, Plaintiffs are entitled to damages, and in the discretion of the Court, punitive damages, attorney's fees and costs.

### D.  BREACH OF WARRANTY/MAGNUSON-MOSS
### As to Volvo

56. Paragraphs 1-55 are herein incorporated.

57. Volvo breached its express written warranty and is liable to Plaintiffs for their damages and a reasonable attorney's fee under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310.

WHEREFORE, Plaintiffs seek actual damages, statutory damages, punitive damages, costs, and a reasonable attorney's fee.

> PLAINTIFFS, TAMARA R. KUITTINEN and
> TERO P. KUITTINEN
>
> By: /s/ *Daniel S. Blinn*
> Daniel S. Blinn (ct02188)
> Consumer Law Group, LLC
> 35 Cold Spring Rd. Suite 512
> Rocky Hill, CT  06067
> Tel. (860) 571-0408
> Fax. (860) 571-7457
> dblinn@consumerlawgroup.com